Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


RICHARD TRZESNIOWSKI,

      Plaintiff,

-vs-

SIGNATURE FLIGHT SUPPORT
CORPORATION,

      Defendant.

_____/

Case No. A 05-191 CV (TMB)



VIDEO DEPOSITION OF RICHARD TRZESNIOWSKI

Pages 1  -  186 inclusive

June 7, 2006, 9:00 a.m.

Anchorage, Alaska

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 26

1   Alamogordo other than Mesa Verde and 84 Lumber?

2        A.  I will stop and think about that, but no, I

3   don't recall.

4        Q.  Okay.

5            Is it your present intention to keep working for

6   84 Lumber?

7        A.  I believe I found the perfect job.

8        Q.  And what makes 84 Lumber the perfect job for

9   you?

10       A.  The people I work with.

11       Q.  And what is it about the people you work for

12  that makes the job perfect?

13       A.  Very polite and respectful.  Work as a team.

14  They don't pay me, but I do work with them.

15       Q.  What do you mean they don't pay you?

16       A.  84 Lumber doesn't pay me.

17       Q.  I see.  M & M pays you?

18       A.  That's right.

19       Q.  But you work with 84 Lumber?

20       A.  That's correct.

21       Q.  And the people there are polite and respectful

22  and that makes the perfect job for you?

23       A.  I have a lot of job satisfaction.

24       Q.  Have you ever had a job anywhere that you liked

25  better than the one you have now?

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 27

1      A.  I liked quite a bit for seven years working for
2   Signature Flight Support.  I enjoyed that very much.
3      Q.  I'll get into some more detail on that as soon
4   as we cover some background.  But as I understand it, you
5   had two different jobs with Signature; is that correct?
6      A.  Maybe three.
7      Q.  What were the three jobs you had?
8      A.  Well, my first three-and-a-half years I fueled
9   aircraft, primarily.
10      Q.  And then what did you do for Signature?
11      A.  After three-and-a-half years I was asked to
12   become a line -- line lead supervisor.
13      Q.  And how long did you do that job?
14      A.  Three-and-a-half years.
15      Q.  So that's approximately seven years, then, into
16   your career at Signature?
17      A.  Yes, sir.
18      Q.  And then what job did you do?
19      A.  Customer service.
20      Q.  Did you like working for Signature Flight
21   Support during the first three-and-a-half years when you
22   fueled aircraft?
23      A.  Yes, I did.
24      Q.  And what did you like about the job at that
25   time?

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 61

1    P-R-E-C-I-P-E (sic), you know, on the edge.

2        Q.  Uh-huh.

3        A.  And then after that, everything was fine.  And

4    Frank was Frank.  And sometimes when you're working in an

5    environment here in Alaska in the dark winter, in the

6    cold, you just got to roll with it and stay out of

7    people's way sometimes, because they're moody and you

8    just treat them with gentleness and kindness and do your

9    job.

10        MR. GAZAWAY:  Wait for the question.

11   BY MR. DEVINE:

12       Q.  I get the impression from this deposition that

13   it's important to you that people be polite; is that fair

14   to say?

15       A.  Well, of course.  That's the way you're going to

16   get along in this world.

17       Q.  Were there people other -- well, who at

18   Signature Flight Support was not polite to you?

19       A.  Duane.

20           You're asking me a question that's -- not --

21   nothing is always-always.

22       Q.  Sure.

23       A.  But, yes, if there was any rudeness, it was from

24   Duane and Frank.

25       Q.  Anybody else that was rude to you besides Duane

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski   Deposition            June 7, 2006

Page 64

1    challenging loud and -- and aggressive?

2         A.  Well, the one primary example that I had gone

3    over and talked to Larry Moss about, the general manager

4    at the time, this was years ago, was about her smoking in

5    the office behind -- behind the front desk.  Because none

6    of the other employees are allowed to smoke in the

7    building, only in a designated area out front.

8         But she arrogantly and presumptuously smoked at

9    will in the building.  And I says I don't like it.  I

10   says I have to breathe it.  I says if I continue

11   breathing that, I'm going to continue smoking -- I'm

12   going to start smoking.  I haven't smoked in almost ten

13   years, Larry.

14        And ultimately, I says -- but they allowed it.

15   She would just -- room was small and there was smoke

16   billowing out of there like a chimney, all loud and

17   aggressive and bulgarious (sic) or whatever, just nobody

18   challenged her.  Even Duane was afraid of her.

19        Q.  And --

20        A.  Acted like he was afraid of her.

21        Q.  And how about you, did you challenge her?

22        A.  No.

23        Q.  Or tell her that what she was doing was against

24   the rules?

25        A.  Doesn't mat -- why would I, a subordinate, when

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                    June 7, 2006

Page 66

1    I tend to, the stuff sometimes, I don't want to remember.

2    But others still do, because they -- over the years I've

3    hear them talk, they remember.

4        Q.  Now, you mentioned that Frank Donaham singled

5    you out because you were a Christian, did Kim Cleeves?

6        A.  I didn't say he singled me out because I was a

7    Christian.  He didn't single me out.  It may have been

8    the way he was towards Christians, all I know is that's

9    the way he was towards me.

10       Q.  All right.  How about Kim Cleeves, was she

11   anti-religious towards you?

12       A.  I don't know.

13       Q.  Did she make any comments to you that you

14   thought she was belittling your religion?

15       A.  No.

16           I don't remember.  I don't think so.

17       Q.  Did anyone at Signature Flight Support other

18   than Frank Donaham make any comments to you that you

19   thought were belittling your religion?

20       A.  There were comments and things made, there was

21   an action taken against me.

22       Q.  All right.  Who were the other people that made

23   comments that you thought were belittling or demeaning

24   your religion?

25       A.  I can't remember the specific comments, but I

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 68

1    going on.  And yet, I forgot it by mistake, they found it

2    and then I got in trouble for having it.

3        Q.  Now, you say you were keeping it hidden because

4    of the attitude and other things that were going on.

5    What was going on?

6        A.  The scrutiny, just, there was a lot of -- I was

7    walking on eggshells.

8        Q.  Why?

9        A.  Because that's what was there, eggshell, an

10   eggshell atmosphere.

11       Q.  And -- but specifically, why?

12       A.  I was under scrutiny.

13       Q.  And what were you under scrutiny for?

14       A.  Good question.  They were trying to fire me in

15   the year 2000, when I was on a workman's comp injury.

16   And this was 2002.  2001, 2002, 2000 -- there was --

17   things were going on behind my back.  And when I came

18   back to work, they wrote me up three times in three or

19   four months, just like that, boom, boom, boom.  So I knew

20   they were after me.  Everybody knew it.

21       Q.  Now, when you say everybody knew they were after

22   you, who -- who was everybody?

23       A.  Well, people were rolling their eyes and making

24   body language as I walked through the door.

25       Q.  And what -- what body language tells you that

Alaska Stenotype Reporters (907) 276-1680

Richard Trzesniowski    Deposition                    June 7, 2006

Page 73

1    Q.  The incident you've described for us with the

2  book that you left on the counter, was that when you were

3  working inside as customer service or was that when you

4  were line supervisor?

5    A.  That's when I was working in -- in -- inside as

6  a customer service.

7    Q.  Do you know if any of your coworkers complained

8  to management about -- about the book?

9    A.  It wasn't management that -- it wasn't any of

10  the co-workers that complained.  They didn't care.  They

11  were reading all the material they wanted.  It didn't

12  matter what it was, you see.  And I never complained

13  about them.  And they never complained about me.  And we

14  got along well.

15    Q.  And what were you told about why the book that

16  you left on the counter was inappropriate?

17    A.  They didn't say.  They just said this is

18  inappropriate reading material for the workplace.

19    Q.  And what did you do at that point?

20    A.  I took the book home and didn't bring it back.

21    Q.  Did you ask anybody why they thought it was

22  inappropriate in the workplace?

23    A.  I wasn't going challenge them, because that's

24  what -- that would have caused conflict.

25    Q.  Other than the incident with the book, were

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 74

1    there other incidents where you thought somebody was

2    belittling or demeaning your religion in some way?

3        A.  Yeah.  I mean, it happened, but I just blew it

4    off.

5        Q.  All right.  What happened?

6        A.  Okay.  Let's see what happened.  Frank had an

7    attitude.  I mean, I can't tell you the attitude.  It was

8    years ago.  I mean --

9        Q.  Yeah, I'm not interested in attitude.  What I'm

10   interested in is facts.  You know, what did Frank do that

11   belittled your religion?

12       A.  Words spoken.  Words spoken.

13       Q.  And what did Frank say that belittled your

14   religion?

15       A.  That he didn't believe it.  He didn't believe in

16   Jesus Christ.  I said, well, that's fine.  That's your

17   business.  If you want to believe it, you're free to

18   believe what you want to believe.

19           He didn't like that.  He wanted to argue.  I

20   says I don't argue, and I'm not going to controvert.  I

21   know what's true and I know what's false.  It might take

22   you some time to find that out for yourself, and I'd

23   leave it alone.  He'd have an attitude.

24           I says:  Jesus Christ can change your life if

25   you give him a chance.  I says just remember that some

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                    June 7, 2006

Page 75

1    day down the road when you have trouble.

2         And then he kind of respected me for that, he

3    was kinder and gentler towards me, because I wasn't

4    trying to convert him.  I says:  Man, life's a choice,

5    you know, you got a choice here every day and you got a

6    choice, the decisions you make.

7         We -- he -- he toned it down a lot.  And other

8    guys, I'd just let it roll off my back, it didn't matter.

9    We learn by consequences.

10        Q.  Okay.  You've given me two examples now, the

11   incident with the book and the words spoken by Frank.

12   What other incidents were there where you thought people

13   were belittling or demeaning your religion?

14        A.  There was a guy at work that bring his Bible all

15   the time and reading it.  And behind his back, they'd

16   make remarks.  You know, it's -- I know you might ask me

17   what remarks, what was said.  I can't say it, because it

18   was too many years ago.  But sure, I would just ignore

19   it.  Make jokes, make fun of him, mock him, you know,

20        Q.  And who was "him," who was the guy?

21        A.  I don't remember.  He was a Mormon guy.  They'd

22   make fun of him.  And he'd read his Bible during lunch

23   all the time.  I says, all I -- you know, it's a good

24   thing, or whatever.

25        Q.  Now, did -- did anyone challenge this man's

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski   Deposition                June 7, 2006

Page 76

1   religion to his face?

2       A.  I don't know.  I just did my job.  I was out in

3   the field a lot.  I was over at Lake Hood a lot most of

4   the day, so, you know, and I'd see him always packing his

5   Bible, which was fine.  And I would just go about my job.

6   And you hear people talking all the time.  And sometimes

7   you just, you know --

8       Q.  Okay.  So this other man would bring his Bible

9   to work; is that what you're saying?

10      A.  Yes.

11      Q.  Did anyone that you know of tell him that he

12  couldn't do that?

13      A.  No.  The funny part about it is nobody ever

14  confronted him and told him to stop.  He eventually quit,

15  but --

16      Q.  Other than you and -- and this man, were there

17  any other Christians that worked at Signature Flight

18  Support?

19      A.  Yes, there was.

20      Q.  And how were they treated?

21      A.  I don't know.  I never discussed it with them or

22  asked them --

23      Q.  Who were --

24      A.  -- how -- how are you getting along at work with

25  your faith?  I just never asked him.

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                    June 7, 2006

Page 101

1    He wouldn't let up.  And I almost walked out.  I almost

2    got up and left, but I stood my ground.  I did not

3    abandon my post.

4        Q.  What was Juan saying to you?

5        A.  Things like I was feminine, I was a sissy, I was

6    wearing a skirt, I was doing a woman's job.  But he kept

7    going on all afternoon.  He kept repeating it.  And he

8    wouldn't lighten up.  And I tried to say something a

9    couple times and I realized that I was giving him fuel on

10   the fire to inappropriately tease and harass me some

11   more, so I kept my mouth shut.  I got tired of it.

12       Q.  What was Juan's last name?

13       A.  I don't know.  But I can find out.  I can't

14   remember, and it may come to me.

15       Q.  You'll get a chance, after the deposition, once

16   this is typed up, I'm sure they'll send you a copy to

17   look over and see if you want to make any corrections or

18   additions.  When you get to this section, when you're

19   reading it, if you can come up with the name --

20       A.  I can.

21       Q.  -- your lawyer can explain to you how you do a

22   correction or an addition on a deposition.

23       A.  Okay.

24       Q.  Had you had problems with Juan before this

25   particular day?

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 108

1  are just women.

2          And so I explained my feelings on that point.

3  And they persuaded or tried to persuade me that because

4  he was Mexican, because he believed differently than we

5  believed, that nothing personal was intended by it.

6          That was one of the very few times in the whole

7  history of my employment with Signature where something

8  bothered me to that degree.  I don't want to be doing

9  desk work like that and having a -- a -- a employee

10  harassing me.  And no supervisor above me there to put a

11  stop to it.  And I couldn't stop it.

12          I took it to management, my commanding officer,

13  Christine (sic) Kirschbaum, Joe Oetker and they both

14  talked me out of it, or made it seem like it was

15  perfectly okay and acceptable because he was Mexican, and

16  they believe differently than we do.

17      Q.  Now, the teasing that was going on, you think

18  that happened on either a Saturday or a Sunday?

19      A.  Yes, it did.

20      Q.  And is that why there was no supervisor in the

21  building at the time?

22      A.  Yes.

23      Q.  Do you know if either Joe Oetker or Christian

24  Kirschbaum talked to Juan about the incident?

25      A.  I don't know if they did or not.

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 109

1    Q.  Did Juan harass you again after that?

2    A.  I never worked with Juan again.  So, no, I never

3  had the opportunity.

4    Q.  When did this occur in terms of your employment

5  with Signature?  Was it towards the end or in the middle,

6  or can you give me an approximate date?

7    A.  I'd say it was October of 2002.

8    Q.  And when was the last day that you worked for

9  Signature?

10    A.  July 14th.

11    Q.  Of which year?

12    A.  2003.

13    Q.  So you continued to work for Signature after

14  this incident, but you never had occasion to work with

15  Juan again?

16    A.  No.  And I was probably covering another

17  employee's.  I did that often.  One time I worked 80

18  hours a week for five months straight from June 1st to

19  October 31st, another time probably 60, 65, hours a week

20  for two years straight, and every holiday for five years.

21  So I probably was filling in Debbie's spot or somebody's

22  spot, I probably was.  Because whenever they asked for

23  anything, any help, I was there, any slot, any space.  So

24  I probably was working over there on a Saturday or

25  Sunday.

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 114

1    excuse me -- about anybody being reprimanded or

2    disciplined?

3        A.  No.  And I never spoke to anybody about the

4    incident except Christian Kirschbaum and Joe Oetker.

5        Q.  Did you ever hear anything back through the

6    employee grapevine about the incident?

7        A.  Never.

8        Q.  Do you know if Juan -- well, I guess if you

9    never heard anything back, you wouldn't know if Juan had

10   been telling anybody else about it, correct?

11       A.  I think it was just an incident for the day.

12       Q.  Other than this incident with Juan, have there

13   been other occasions when you worked for Signature where

14   you felt you were the victim of harassment?

15       A.  Might have been a little bit, but not like that

16   that day.  I mean, there was -- there was harassment

17   with, you know, internet -- internet sexual jokes,

18   constant, you know, porno in the workplace, videos being

19   played, magazines being passed around, sexually explicit

20   stuff.

21           I got tired of it.  I didn't thing that it

22   was -- needed to be there, you know.  I didn't think

23   people needed that kind of visual stuff to -- at night

24   they'd watch them on the videos in the line room.

25       Q.  Now, these internet jokes, were those directed

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                    June 7, 2006

Page 115

1    to you?

2          A.   They were just directed, I can't say to who.

3          Q.   How -- how was it that you read them?

4          A.   I didn't read them.  They were laying on the --

5    they were always placed on the counter in the morning.

6    Lot of them I just throw them away or left them alone

7    because they were theirs.  They belonged to whoever took

8    them off the computer, was responsible.

9          Q.   Do you know who that was?

10         A.   Actually, no.  I did not have access to a

11   computer at that base.

12         Q.   All right.  And which -- which base was that?

13         A.   The private sector off International Airport

14   Road between -- right there up from FedEx there, or what

15   do they call that?

16         Q.   All right.  Is this the one that you were saying

17   was over near Lake Hood?

18         A.   Yeah.  Yeah.

19         Q.   Did the same issue with internet jokes take

20   place at the facility over on the Era Aviation side of

21   the field?

22         A.   No.  Maybe a couple times maybe for -- a

23   couple -- but it was nothing, it was just brief.  It

24   wasn't consistent every day, every morning.  It was just

25   a couple times probably.  But over at the other place it

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 116

1    was every single day practically.

2        Q.  Now, you had mentioned that you had complained

3    to Joe Oetker and Christian (sic) Kirschbaum about Juan.

4    Did you complain to anybody about the internet jokes?

5        A.  Yes.  I called Or -- Orlando.  Now that

6    everybody can see me on video knows who did it, yes, I

7    called Orlando.  And I also complained about the sexually

8    explicit pin-ups and all this other stuff.  I'm the one

9    that did it.

10        Q.  All right.  And so -- so we're clear, when you

11    say "called Orlando" you're not talking about an

12    individual named Orlando, you're talking about calling

13    the corporate headquarters in Orlando?

14        A.  The corporate -- corporate executive, yeah.

15        Q.  And I take it you did that anonymously?

16        A.  Yeah, we're real anonymous.

17        Q.  But at the time you made the complaint?

18        A.  Yeah, but everybody figured out who.  It's quite

19    obv -- there's only one, who could that possibly be?

20    It's just process of elimination, like anything else.

21    They figured out it was me.

22        Q.  And when did you make that complaint to the

23    corporate headquarters in Orlando?

24        A.  That was -- actually, that was in 2000, summer

25    of 2000.

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

1    Q.   And you say everybody figured out that it was

2    you.  So obviously somehow the employees were told that a

3    complaint had been made, correct?

4    A.   I don't know who really figured out what.  And I

5    don't know if all of them figured out anything, but I can

6    assure you that there are those who know who, that I was

7    the one.  I think that they would rather keep to

8    themselves, not pass it around, because it'd get back to

9    me, even though I already know.

10        I don't -- they cleaned that up, most of it.

11   But there was still stuff coming through the computer for

12   a long time, every morning, just jokes, this and that.

13   After a while you get tired of all their sexual stuff,

14   you know, because, you just do.

15   Q.   Now, when you say they cleaned it up, I take it

16   then somebody then at the corporate headquarters in

17   Orlando must have called up to Anchorage and said:  No

18   more porn videos, no more magazines, no more internet

19   jokes getting passed around the office?

20   A.   Well, they had cleaned up the porn stuff on

21   their own before the pictures ever went.  That was a

22   private, quiet thing that was never mentioned until

23   later.

24        But, yes, they managed to realize some things on

25   their own.  And then what they thought or how they

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 118

1    thought or who thought what, I don't know.  I just told

2    them they needed to get rid of it.

3        Q.  And after -- after you made that complaint to

4    Orlando, some action apparently got taken?

5        A.  There was action taken, yes.

6        Q.  And is it, that fact that action was taken that

7    caused people to start speculating as to who made the

8    anonymous report?

9        A.  I believe so.

10       Q.  Did anyone accuse you of making the anonymous

11   report?

12       A.  No.

13       Q.  Or did anyone threaten you because they thought

14   you had made the anonymous report?

15       A.  No.

16       Q.  Did anyone treat you differently after the

17   report was made?

18       A.  Yeah, because when I came -- came back to work,

19   there was -- yes, there was a lot of bad feelings.  There

20   was distance, there was coldness.  All of a sudden I felt

21   like an outsider.  I was walking on eggshells.  It was

22   just more tension, less openness and good feeling-tone,

23   people were uptight.

24       Q.  All right.  Any other incident that -- where you

25   would consider yourself the victim of harassment other

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition              June 7, 2006

Page 132

1  called physical demands.  And in the second paragraph

2  you'll see it says:  While performing the duties of this

3  job, the employee is regularly required to stand, walk,

4  use hands to finger, handle or feel, reach with hands and

5  arms, climb or balance, stoop, kneel, crouch or crawl and

6  talk or hear.  The employee is occasionally required to

7  sit.  The employee must regularly lift and move up to 50

8  pounds above the head.  Specific vision abilities

9  required by this job include close vision, night vision

10 and distance vision.

11        Do you see that?

12     A.  Uh-huh.

13     Q.  Is it your understanding that after your

14 Workers' Comp injury, there were restrictions placed upon

15 you that would keep you from doing things like lifting 50

16 pounds above your head?

17     A.  Okay.  What was the question again?

18     Q.  Sure.  Is it your understanding that after your

19 Workers' Comp injuries, your doctors reported that there

20 were some parts of the job out on the ramp that you

21 couldn't do anymore?

22     A.  I believe that's probably true.

23     Q.  And it's in response to that that you moved

24 inside to the customer representative position; is that

25 correct?

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                    June 7, 2006

Page 133

1       A.  That's correct.

2       Q.  Let me show you what's been marked as Exhibit 8.

3   If you could take a look at that and see if you can

4   identify that document for us.

5           I'm sorry, I gave you the wrong exhibit.  Ignore

6   Exhibit 8.  My mistake.  Let me give you Exhibit 9.  Have

7   you seen Exhibit 9 before?

8       A.  Yeah, I -- I have seen this, uh-huh.

9       Q.  And is that the -- the job that you were given

10  as the customer service representative following your

11  return from your Workers' Comp injury?

12      A.  Yes, sir.

13      Q.  And is that your signature on the first page of

14  Exhibit 9?

15      A.  Yes.

16      Q.  And you accepted the position as customer

17  service representative; is that correct?

18      A.  That's correct.

19          MR. DEVINE:  Let's take a five-minute break.

20          Hal told me he needs a break every hour.

21          THE VIDEOGRAPHER:  Off record 2:03 p.m.

22              (Thereupon, a brief recess was taken, after

23              which the following proceedings were had:)

24          THE VIDEOGRAPHER:  We are on record at 2:10 p.m.

25  BY MR. DEVINE:

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 148

1                (Thereupon, a brief recess was taken, after

2                which the following proceedings were had:)

3           THE VIDEOGRAPHER:   On record 2:38 p.m.

4      BY MR. DEVINE:

5           Q.   While we were off the record I think we

6      established that you were married at sometime around, in

7      July of 2 -- of 1996?

8           A.   Correct.

9           Q.   All right.   So it's -- it is not as though you

10     had a split from your wife in 2003 that would help

11     contribute to anxiety in your life, correct?

12          A.   Correct.

13          Q.   Other than that marriage in July of 1996 that

14     lasted, I think you said, four months, have you been

15     married any other times?

16          A.   One other time.

17          Q.   And when was that?

18          A.   Trying to think, May 20th, 2005.

19          Q.   Is that somebody you met in Alamogordo?

20          A.   Uh-huh.

21          Q.   And I think I'd asked you earlier if you were

22     living with anybody and you said no.   So does that mean

23     that that marriage ended in some fashion?

24          A.   (Witness nods head in the affirmative.)   Yeah,

25     it's over.

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition              June 7, 2006

Page 158

1   BY MR. DEVINE:

2        Q.  All right.  In the first section --

3        MR. GAZAWAY:  There's two sections.  There's a

4   conflict, there's two different pieces of the

5   information and two different sections, a typed form

6   for typed-in information.

7        MR. DEVINE:  You're absolutely right.

8   BY MR. DEVINE:

9        Q.  So in the first section, if I read this

10  correctly, your employer is saying that your last date of

11  work was April 14th, 2003, but that you were paid through

12  April 24, 2003.  And in the employee section you're

13  claiming that the last date you worked was April 24,

14  2003.  Is that how we should read this document?

15       A.  The day that I last worked was April 24th and

16  here I have first missed work due to disability on May

17  5th.

18       Q.  Do you have a current memory of what your last

19  day was that you actually showed up for work?

20       A.  Somewhere -- I know somewhere at the end of

21  April.  I always figured it was about April 24th, or

22  April 27th, but here it says April 24th.

23       I thought it was the 27th or 28th, but I was

24  wrong, it was April 24th.

25       Q.  All right.  Just so I -- I'm clear, do you

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 159

1    blame -- believe then that your employer is wrong when

2    they say the last day you worked was April 14th of 2003?

3         A.  Yes.

4         Q.  And, again, drawing your attention to Exhibit

5    13, which is that memo from Karen Galvin, the licensed

6    psychological associate, you do not have a memory of Ms.

7    Galvin reporting that you need to -- you needed to leave

8    work because of stress in mid-April?

9         A.  No, I never saw this.

10        Q.  I didn't ask you if you saw it.  I am saying --

11        A.  No.  Kim never --

12        Q.  Let -- let me put this way.  Do you deny that

13   you left work in mid-April 2003 because of stress and

14   anxiety?

15        A.  Do I do what?

16        Q.  Do you deny that?

17        A.  No, I don't.

18        Q.  Do you admit that?

19        A.  I was told -- told Kim that I had a lot of

20   stress because of the job.  And I guess stress and

21   anxiety are pretty much one in the same, I don't know.

22        Q.  But do you admit that you left work in mid-April

23   of 2003 because of that stress and anxiety?

24        A.  April 24th, yes.

25        Q.  All right.  So you -- let me -- I just want to

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3

Richard Trzesniowski    Deposition                June 7, 2006

Page 177

1        I take it, then, that this teasing was between
2   1993 and 1996?
3        A.  Yeah.  And there was things after, after the --
4   after she left, it was a big joke for them, you know.
5   But nevertheless, yes.
6        Q.  I -- your choice to remain celibate, I presume,
7   I mean maybe I'm wrong, but I presume ended when you got
8   married in 1996, correct?
9        A.  Could you repeat that?
10       Q.  Yes.  When it -- when it talks about this choice
11  to remain celibate until you married, I assume that you
12  were no longer celibate after you got married in 1996; is
13  this a correct assumption?
14       A.  Uh-huh.  Yeah.
15       Q.  Was -- was that a yes?
16       A.  Yes.
17       Q.  Okay.
18       A.  Very hard to --
19       MR. GAZAWAY:  No.  Just wait for a question.
20  BY MR. DEVINE:
21       Q.  Did you own a house in Anchorage?
22       A.  Yes.
23       Q.  And where was that located?
24       A.  Off of Dowling and Doil Drive.
25       Q.  All right.  Is that the address that's on these

Alaska Stenotype Reporters (907) 276-1680

229443bc-b361-4ee5-8048-ed8faeeae6d3