IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


RICHARD TRZESNIOWSKI,

     Plaintiff,

-vs-

SIGNATURE FLIGHT SUPPORT
CORPORATION,

     Defendant.

_____/

Case No. A 05-191 CV (TMB)


VIDEO DEPOSITION OF RICHARD TRZESNIOWSKI

Pages 1 - 186 inclusive

June 7, 2006, 9:00 a.m.

Anchorage, Alaska

1     Q.  Did you run into any mean characters at

2   ServiceMaster?

3     A.  No, they were -- they were fine.

4     Q.  Did you run into any mean characters at

5   Signature?

6     A.  Yes.

7     Q.  And who did you run into that was mean at

8   Signature?

9     A.  Duane Sperbeck.

10    Q.  And what job did Duane Sperbeck have at

11   Signature?

12    A.  He was the, I guess you could say the base

13   commander, the superior supervisor.

14    Q.  And what did Mr. Sperbeck do that was mean?

15    A.  Duane was very aggressive.

16    Q.  And can you give me an example of what Mr.

17   Sperbeck did that was aggressive or mean?

18    A.  It was his attitude.  He was rude,

19   disrespectful, condescending.

20    Q.  Can you give me a specific example of a time

21   when you thought that Mr. Sperbeck was rude to you or

22   disrespectful to you or condescending to you?

23    A.  Can I -- would you repeat that?

24    Q.  Yes.  I'm asking you to give me a specific

25   example when Mr. Sperbeck was mean to you or rude to you

1  remember a specific incident.

2     **Q. And what was that incident?**

3     A. Well, I had a book at work called Dialogue With

4  God.  And I was told specifically, under no terms, by

5  Duane Sperbeck and Camille Gates that the reading

6  material that I had at my desk was inappropriate, was the

7  term they used, inappropriate for the workplace.

8     **Q. Did they say why?**

9     A. No.

10    **Q. Were you encouraging other people in the**

11    **workplace to read the book?**

12    A. No.  As a matter of fact, that's exactly what I

13  wasn't doing.

14    **Q. Were you reading passages out loud?**

15    A. No.  In fact, I kind of kept the book hidden.

16  The only way they found it was I went over to hangar 3

17  one night to help move an aircraft, because they were

18  shorthanded and laid the book on the counter, did my job.

19  It was close to going home time for me, it was probably

20  minutes over the clock.  So I clocked out, went home

21  forgot the book.

22       And the next morning I was confronted; they had

23  it.  And they confronted me.  I kind of kept the book

24  hidden.  I didn't want them to see it because of the

25  attitude surrounding everything else that was going --

1  going on. And yet, I forgot it by mistake, they found it

2  and then I got in trouble for having it.

3  **Q. Now, you say you were keeping it hidden because**

4  **of the attitude and other things that were going on.**

5  **What was going on?**

6  A. The scrutiny, just, there was a lot of -- I was

7  walking on eggshells.

8  **Q. Why?**

9  A. Because that's what was there, eggshell, an

10  eggshell atmosphere.

11  **Q. And -- but specifically, why?**

12  A. I was under scrutiny.

13  **Q. And what were you under scrutiny for?**

14  A. Good question. They were trying to fire me in

15  the year 2000, when I was on a workman's comp injury.

16  And this was 2002. 2001, 2002, 2000 -- there was --

17  things were going on behind my back. And when I came

18  back to work, they wrote me up three times in three or

19  four months, just like that, boom, boom, boom. So I knew

20  they were after me. Everybody knew it.

21  **Q. Now, when you say everybody knew they were after**

22  **you, who -- who was everybody?**

23  A. Well, people were rolling their eyes and making

24  body language as I walked through the door.

25  **Q. And what -- what body language tells you that**

1    they're after you?

2        A.  Well, people would say be careful.  You need to

3    watch it.

4        Q.  All right.  Who -- who -- who told you to be

5    careful and that you needed to watch it?

6        A.  I don't remember.

7        Q.  What were people doing behind your back?

8        A.  I don't know.

9        Q.  You know they were doing something, but you

10   don't know what?

11       A.  Well, I had three phone calls at home from

12   different employees warning me --

13       Q.  All right.

14       A.  -- on my return that they were going to

15   discourage me.

16       Q.  All right.  Who were the three employees who

17   called you at home warning you?

18       A.  Gary Music, Shawn Callahan, Grant -- Grant

19   Thompson.

20       Q.  All right.  What did Gary Music warn you about?

21       A.  He told me that he had overheard the upper

22   management talking about or devising a ploy to discharge

23   me upon my return from my workman's comp injury and that

24   I needed to be very careful.

25       Q.  All right.

1  have heavy lifting?

2      A. That's correct.

3      **Q. Do you think that Signature placed you in the**

4  **customer service position as some sort of scheme to**

5  **ultimately engineer your firing, or to get rid of you?**

6      A. I don't believe that, no.

7      **Q. After you were placed in the new position, were**

8  **you still walking around on eggshells?**

9      A. That's when the eggshells started, when I was

10  placed in that position, not before then. Before then I

11  was working on the ramp, I was delegating and supervising

12  and what have you.

13      Wasn't until I injured myself. In fact, I went

14  to work with the injury and I figured: Oh, well. And

15  they looked at me, said you better go to doctor. They

16  did an MRI and discovered I had a neck injury that was

17  serious enough to pull me off the job. I was very pretty

18  well dedicated to this job.

19      **Q. Did you like the job working out on the ramp**

20  **better than working inside in customer service?**

21      A. I've always been an outdoor person, yes.

22      **Q. When you were working inside in customer**

23  **service, were you still able to supervise others and**

24  **delegate responsibilities?**

25      A. No.

1    Q. The incident you've described for us with the
2  book that you left on the counter, was that when you were
3  working inside as customer service or was that when you
4  were line supervisor?
5    A. That's when I was working in -- in -- inside as
6  a customer service.
7    Q. Do you know if any of your coworkers complained
8  to management about -- about the book?
9    A. It wasn't management that -- it wasn't any of
10  the co-workers that complained. They didn't care. They
11  were reading all the material they wanted. It didn't
12  matter what it was, you see. And I never complained
13  about them. And they never complained about me. And we
14  got along well.
15    Q. And what were you told about why the book that
16  you left on the counter was inappropriate?
17    A. They didn't say. They just said this is
18  inappropriate reading material for the workplace.
19    Q. And what did you do at that point?
20    A. I took the book home and didn't bring it back.
21    Q. Did you ask anybody why they thought it was
22  inappropriate in the workplace?
23    A. I wasn't going challenge them, because that's
24  what -- that would have caused conflict.
25    Q. Other than the incident with the book, were

1  that's a perfectly acceptable answer as well.  I don't
2  want you to get trapped into an answer that you don't
3  really believe because you were trying to be helpful to
4  me and -- and guess about something.
5      A. Okay.
6      Q. Did the training program cover how to report
7  harassment?
8      A. Don't remember.
9      Q. Did you, during the time you were at Signature
10 Flight Support, witness sexual harassment?
11     A. Which base?
12     Q. Um --
13     A. There's two bases we're talking about.
14     Q. I guess, let's do either.
15     A. Not directly.
16     Q. Were you ever a victim of sexual harassment?
17     A. One time.
18     Q. And why don't you tell us about that.
19     A. I was working the desk and Juan what's his name,
20 all afternoon, was insinuating that I was wearing a skirt
21 and insinuating femininity -- femininity.  And it got
22 so -- by the end of the day I just -- I almost walked --
23 I almost got up and left, walked out, because he was
24 harassing me, harassing me, harassing me, harassing me,
25 harassing me, harassing me, harassing me, all afternoon.

Page 101

1   He wouldn't let up. And I almost walked out. I almost
2   got up and left, but I stood my ground. I did not
3   abandon my post.
4   **Q. What was Juan saying to you?**
5   A. Things like I was feminine, I was a sissy, I was
6   wearing a skirt, I was doing a woman's job. But he kept
7   going on all afternoon. He kept repeating it. And he
8   wouldn't lighten up. And I tried to say something a
9   couple times and I realized that I was giving him fuel on
10  the fire to inappropriately tease and harass me some
11  more, so I kept my mouth shut. I got tired of it.
12  **Q. What was Juan's last name?**
13  A. I don't know. But I can find out. I can't
14  remember, and it may come to me.
15  **Q. You'll get a chance, after the deposition, once**
16  **this is typed up, I'm sure they'll send you a copy to**
17  **look over and see if you want to make any corrections or**
18  **additions. When you get to this section, when you're**
19  **reading it, if you can come up with the name --**
20  A. I can.
21  **Q. -- your lawyer can explain to you how you do a**
22  **correction or an addition on a deposition.**
23  A. Okay.
24  **Q. Had you had problems with Juan before this**
25  **particular day?**

Page 102

1    A. Never.

2    **Q. Had -- had you worked with him before?**

3    A. I can't say.  This must -- see -- I don't know.

4    **Q. Okay.  You say you were working the desk?**

5    A. Yes.

6    **Q. Where was Juan working?**

7    A. He was in the lobby waiting for aircraft to come

8    in.

9    **Q. And -- and was he somebody that normally worked**

10   **out on the ramp?**

11   A. Yes.

12   **Q. And had you worked with him when you were**

13   **working out on the ramp?**

14   A. No.  He was a new employee.

15   **Q. And do you know how long he'd been employed by**

16   **Signature at the time that this incident took place?**

17   A. Not long, maybe -- maybe a couple months.

18   **Q. And you hadn't had any run-ins with him about**

19   **anything?**

20   A. Not at all.

21   **Q. And any idea of why he was accusing you of being**

22   **feminine?**

23   A. He was using me for his -- his comedy.  I was an

24   object or subject of his laughter that day.

25   **Q. And any idea what triggered it, what started him**

1  **doing this?**

2    A.  I wouldn't know why somebody chose lemon

3  meringue or apple pie.  I have no clue.

4    **Q.  So you don't have a clue as to why he would**

5  **suddenly start talking to you about you're feminine and**

6  **wearing a skirt?**

7    A.  Well, there was more I said.  I thought I said

8  there was more said.  There was -- it was -- it was a

9  lot -- a lot of things were said, he was saying.

10    **Q.  All right.  What -- what else did he say besides**

11  **that you were feminine and wearing a skirt?**

12    A.  Well, things like maybe you should put a bra on

13  and stuff.  You're doing a woman's job.  He would repeat

14  it over and over again.

15      What excited him, I have no idea.  If I did,

16  I -- I -- I would tried to defuse it.  I tried to talk to

17  him a couple times and I saw this ain't going to work

18  with him.

19    **Q.  For example, I presume you weren't wearing a**

20  **kilt or something that he would then say you're wearing a**

21  **skirt.  You were wearing --**

22    A.  I wasn't wearing -- no.

23    **Q.  Your regular uniform trousers, whatever they had**

24  **you wear as a customer service --**

25    A.  A blazer and slacks and a tie and -- and dress

Page 104

1    shirt, yes, that's what I was wearing.

2        **Q.  Was Juan the only employee to accuse you of**

3    **being feminine?**

4        A.  There was other employees around, but they would

5    not -- they never took part in his verbal harassment with

6    me.  And it was harassment because he would not let up.

7    He continued and continued and continued and continued

8    and continued and continued.  He continued and continued

9    all afternoon.

10       **Q.  All right.**

11       A.  And I was going to get up and leave.

12       **Q.  And -- and --**

13       A.  I called the supervisor at home, but there was

14   no answer, namely Camille Gates.

15       **Q.  And, as you're sitting here today, you just have**

16   **no idea what could have possibly teed him off to do that,**

17   **right?  Is that what you're telling us?**

18       A.  That's what I'm saying.

19       **Q.  Okay.**

20       A.  You have no idea.  I think he was bored and I

21   became the object of his scorn.

22       **Q.  Did he tease anybody else that you're aware of?**

23       A.  No.

24       **Q.  You're the only one that -- as far as you know,**

25   **you're the only one that Juan has ever teased like this?**

1    A.  Well, I didn't say that.

2    Q.  I'm sorry.  I thought you did.  But, okay.  Who

3  else did Juan tease in a same manner?

4    A.  I have no idea.  I have no idea.

5    Q.  Okay.

6    A.  Yeah.

7    Q.  So you don't know if he teased anybody else or

8  not?

9    A.  I have no idea, no.

10    Q.  You do know that he teased you one afternoon,

11  all afternoon?

12    A.  All afternoon for a number of hours.

13    Q.  Now you had mentioned that you tried to call

14  somebody at home.  Who was that?

15    A.  Camille Gates.

16    Q.  And what was your purpose in calling Camille

17  Gates?

18    A.  Why, my purpose and my intention was to let her

19  know that unless somebody, they got coverage for me, I

20  was leaving.  I was going to walk out, because I

21  wasn't -- I couldn't take anymore of his -- it was not a

22  good situation.  It was mockery.  He was mocking me.  And

23  I got -- nobody liked to be mocked.  I got tired of it,

24  but I held my post.

25    Q.  And I take it you weren't able to reach Camille

Page 106

1  **Gates?**

2      A. No, I wasn't.

3      **Q. And what happened to keep you from leaving?**

4      A. I decided that, I looked at the time frame and

5  figured that I could weather this out and I would deal

6  with it in a another manner that was more appropriate.

7  And that leaving would not be appropriate because they

8  may not -- first of all, we needed coverage. I couldn't

9  leave without it. And that would just disrupt things for

10  somebody else. So I decided I'll just take it.

11      **Q. And did Juan continue to tease you after that?**

12      A. Yes, because he didn't know what was going on.

13  He didn't know who I was calling or what I was thinking.

14  These are my own private thoughts I'm sharing. And then

15  I decided to deal with it differently.

16      **Q. All right. How did you decide to deal with it?**

17      A. I contacted, I believe it was -- I know it was

18  Joe Oetker. Let me be correct here. Joe Oetker

19  Christian Kirschbaum (sic), the general manager. And we

20  met in Christian's (sic) office.

21      **Q. Now, is this the same day that the teasing is**

22  **going on, or is this later that you contact Joe Oetker**

23  **and Christian Kirschbaum?**

24      A. I believe that I possibly, was two days later

25  because Sunday, of course, then it could have -- it was a

1   day or two later, because Christian Kirschbaum had the
2   weekend off, of course.  And this may have been on a
3   Saturday that this happened or Sunday.  I'm not certain,
4   but it was a day or two later.
5       **Q. All right.  And you say you met with Christian**
6   **(sic) Kirschbaum?**
7       A. In her office.
8       **Q. And was Joe Oetker also there?**
9       A. Yes.
10      **Q. All right.  What happened in that meeting?**
11      A. I explained the -- how things were very
12  uncomfortable for me.  I didn't -- that's one thing, I
13  don't want to be somebody's object of comedy at my
14  expense, and using -- I'm definitely not feminine or wear
15  a skirt.  And I'm not doing a woman's job.  And I wanted
16  them to know how I felt about the whole thing, that there
17  should be some appropriation administered so this doesn't
18  happen again.
19          I told them my feelings.  And basically they
20  said that he was from either Arizona or New Mexico or
21  somewhere, and that Mexican people, men, look at desk
22  work as though it is women's work.  And I said that
23  doesn't make any difference.  I'm not down in the south,
24  I'm in Alaska.  And we have -- we know the truth.  I am a
25  customer service -- service agent.  Does that mean nurses

**Page 108**

1    are just women.

2         And so I explained my feelings on that point.

3    And they persuaded or tried to persuade me that because

4    he was Mexican, because he believed differently than we

5    believed, that nothing personal was intended by it.

6         That was one of the very few times in the whole

7    history of my employment with Signature where something

8    bothered me to that degree. I don't want to be doing

9    desk work like that and having a -- a -- a employee

10   harassing me. And no supervisor above me there to put a

11   stop to it. And I couldn't stop it.

12        I took it to management, my commanding officer,

13   Christine (sic) Kirschbaum, Joe Oetker and they both

14   talked me out of it, or made it seem like it was

15   perfectly okay and acceptable because he was Mexican, and

16   they believe differently than we do.

17        **Q. Now, the teasing that was going on, you think**

18   **that happened on either a Saturday or a Sunday?**

19        A. Yes, it did.

20        **Q. And is that why there was no supervisor in the**

21   **building at the time?**

22        A. Yes.

23        **Q. Do you know if either Joe Oetker or Christian**

24   **Kirschbaum talked to Juan about the incident?**

25        A. I don't know if they did or not.

Page 109

1    **Q.  Did Juan harass you again after that?**

2    A.  I never worked with Juan again.  So, no, I never

3    had the opportunity.

4    **Q.  When did this occur in terms of your employment**

5    **with Signature?  Was it towards the end or in the middle,**

6    **or can you give me an approximate date?**

7    A.  I'd say it was October of 2002.

8    **Q.  And when was the last day that you worked for**

9    **Signature?**

10    A.  July 14th.

11    **Q.  Of which year?**

12    A.  2003.

13    **Q.  So you continued to work for Signature after**

14    **this incident, but you never had occasion to work with**

15    **Juan again?**

16    A.  No.  And I was probably covering another

17    employee's.  I did that often.  One time I worked 80

18    hours a week for five months straight from June 1st to

19    October 31st, another time probably 60, 65, hours a week

20    for two years straight, and every holiday for five years.

21    So I probably was filling in Debbie's spot or somebody's

22    spot, I probably was.  Because whenever they asked for

23    anything, any help, I was there, any slot, any space.  So

24    I probably was working over there on a Saturday or

25    Sunday.

1    was every single day practically.

2    **Q. Now, you had mentioned that you had complained**

3    **to Joe Oetker and Christian (sic) Kirschbaum about Juan.**

4    **Did you complain to anybody about the internet jokes?**

5    A. Yes. I called Or -- Orlando. Now that

6    everybody can see me on video knows who did it, yes, I

7    called Orlando. And I also complained about the sexually

8    explicit pin-ups and all this other stuff. I'm the one

9    that did it.

10    **Q. All right. And so -- so we're clear, when you**

11    **say "called Orlando" you're not talking about an**

12    **individual named Orlando, you're talking about calling**

13    **the corporate headquarters in Orlando?**

14    A. The corporate -- corporate executive, yeah.

15    **Q. And I take it you did that anonymously?**

16    A. Yeah, we're real anonymous.

17    **Q. But at the time you made the complaint?**

18    A. Yeah, but everybody figured out who. It's quite

19    obv -- there's only one, who could that possibly be?

20    It's just process of elimination, like anything else.

21    They figured out it was me.

22    **Q. And when did you make that complaint to the**

23    **corporate headquarters in Orlando?**

24    A. That was -- actually, that was in 2000, summer

25    of 2000.

Page 117

1    **Q. And you say everybody figured out that it was**
2    **you. So obviously somehow the employees were told that a**
3    **complaint had been made, correct?**
4    A. I don't know who really figured out what. And I
5    don't know if all of them figured out anything, but I can
6    assure you that there are those who know who, that I was
7    the one. I think that they would rather keep to
8    themselves, not pass it around, because it'd get back to
9    me, even though I already know.
10        I don't -- they cleaned that up, most of it.
11   But there was still stuff coming through the computer for
12   a long time, every morning, just jokes, this and that.
13   After a while you get tired of all their sexual stuff,
14   you know, because, you just do.
15   **Q. Now, when you say they cleaned it up, I take it**
16   **then somebody then at the corporate headquarters in**
17   **Orlando must have called up to Anchorage and said: No**
18   **more porn videos, no more magazines, no more internet**
19   **jokes getting passed around the office?**
20   A. Well, they had cleaned up the porn stuff on
21   their own before the pictures ever went. That was a
22   private, quiet thing that was never mentioned until
23   later.
24        But, yes, they managed to realize some things on
25   their own. And then what they thought or how they

1   thought or who thought what, I don't know.  I just told
2   them they needed to get rid of it.
3       Q.  And after -- after you made that complaint to
4   Orlando, some action apparently got taken?
5       A.  There was action taken, yes.
6       Q.  And is it, that fact that action was taken that
7   caused people to start speculating as to who made the
8   anonymous report?
9       A.  I believe so.
10      Q.  Did anyone accuse you of making the anonymous
11  report?
12      A.  No.
13      Q.  Or did anyone threaten you because they thought
14  you had made the anonymous report?
15      A.  No.
16      Q.  Did anyone treat you differently after the
17  report was made?
18      A.  Yeah, because when I came -- came back to work,
19  there was -- yes, there was a lot of bad feelings.  There
20  was distance, there was coldness.  All of a sudden I felt
21  like an outsider.  I was walking on eggshells.  It was
22  just more tension, less openness and good feeling-tone,
23  people were uptight.
24      Q.  All right.  Any other incident that -- where you
25  would consider yourself the victim of harassment other

1   than this incident with Juan and then what we've talked

2   about with the internet jokes, the magazines and the

3   videos?

4       A. Would you repeat that?

5       Q. Yes. Other than Juan, and other than this

6   complaint you made about the internet jokes, the

7   magazines and the videos, is there anything else you can

8   think of while you were working for Signature that you

9   would consider to have been harassing towards you?

10      A. There was -- I felt that there was different

11  kinds of treatment that was directed towards me that

12  wasn't directed towards other employees.

13      Q. All right.  And give me some specifics on that.

14  How were you treated differently than other employees?

15      A. I was treated to the letter of the law.

16  In other words, other people were sliding with their,

17  whatever they were doing on the job with mistakes,

18  sleeping on the job, they were given grace.  And I was

19  written up:  Wrong pants, making three errors on the POS

20  machine, anything that they could find, they were on me

21  right now.

22          Other people were constantly exhibiting poor job

23  performance, making mistakes on tickets that I was

24  correcting, things being brought to their attention.  I

25  was being -- I felt -- the general manager of Signature

1  Flight Support, Christian (sic) Kirschbaum said that I

2  could wear the pants I was wearing because I did not have

3  a uniform.  So a couple days later they decided that they

4  would write me up for wearing the wrong pants to work,

5  even though the general manager of Signature Flight

6  Support in Anchorage, Alaska, Christian Kirschbaum, said

7  I could wear those pants.

8       Ultimately Kim Cleeves came in, wrote me up for

9  wearing the wrong pants.  I did not have a uniform yet.

10  So that's just one case in point.

11  **Q.  And is this when you were working out on the**

12  **ramp or when you were in customer representative --**

13  A.  I was doing customer service rep work.

14  **Q.  And did -- were there other people that wore**

15  **what you would consider to be the wrong pants that were**

16  **customer service representatives?**

17  A.  There was one customer service agent they

18  allowed to wear shorts, little, I guess you call it

19  little top, some kind of top, short sleeves, I don't know

20  what you'd call it, with little short shorts and tennis

21  shoes.  That's the way he would dress.  And they would

22  allow him to dress like that.

23  **Q.  And was that before or after you were written**

24  **up?**

25  A.  It was after I was written up.

1    **Q. And who was that?**

2    A.  Derek -- let me see, what was his name?

3    Derek -- let's leave that blank and I'll have the name

4    for you.

5    **Q. But it's Derek something?**

6    A.  I'm not certain about that.  I have the name in

7    Alamogordo.  I have other information and papers that, I

8    did not bring anything with me, but I do have the name.

9    I definitely have his name, because that was an issue,

10   how the company could allow one to wear what he wants and

11   the other, write him up for wearing the wrong pants that

12   they say that he can wear.  I felt that that was

13   harassment.

14   **Q. Now, do you know if any other employees were**

15   **written up for any infractions?**

16   A.  Over the years there was some, yes.

17       I never -- I personally, as a supervisor, never

18   wrote anybody up.  I didn't feel it was necessary.  There

19   was other ways to deal with it.  But on the other hand,

20   Duane granted their job, too.

21   **Q. I -- I guess what I'm asking is you're -- you**

22   **are believing that you were singled out to be written up**

23   **for different things.  And I'm asking how do you -- how**

24   **do you -- how is it you know that other people weren't**

25   **also written up?**

1    A. Well, how do you justify one wearing whatever he

2    wants and one wearing pants he says it's okay until that

3    time, and then he's scrutinized and written up?  How do

4    you justify that?

5    **Q. The -- the other one you're talking about, I**

6    **take it, is in the same facility?**

7    A. Customer service rep.

8    **Q. And in the same building?**

9    A. Same building, same desk.

10   **Q. And how often did the other person wear what you**

11   **would consider to be the inappropriate items of clothing?**

12   A. I would say three, four days a week.  It was

13   cons -- consistent, it was in the summer, summertime.

14   **Q. When the management of Signature writes somebody**

15   **up for some infraction like they did for you, are those**

16   **publicly posted, or are those privately given to the**

17   **employee?**

18   A. They're given to the employee.

19   **Q. And so if somebody else was written up for some**

20   **infraction, you wouldn't necessarily know about it,**

21   **correct?**

22   A. I may not necessarily know about it.  I may not.

23   **Q. The incident that you're talking about with**

24   **the -- the wrong slacks, when was that?**

25   A. It was sometime in December of 2002, I believe.

1    And on a few occasions employees gave me piles

2    of tickets and there'd be maybe just a few over a long

3    period of time that I -- I would miss one. And Kim would

4    see it and find out and bring it to my attention.

5    And then I -- after a few of those, I got

6    written up. And after hundreds and hundreds and hundreds

7    and hundreds and hundreds and hundreds of tickets later,

8    I missed a couple more and I got written up. So I just

9    accepted it, you know. If you want perfection, I'm a

10    perfectionist, but I guess I'm not a -- as a

11    perfectionist as I thought, because I missed a couple.

12    **Q. Did you ever get a warning for making negative**

13    **statements to vendors and coworkers about your job at**

14    **Signature Flight Support or the general manager?**

15    A. No. And I don't understand where that came

16    from, because I know exactly what went on. I was there.

17    **Q. What went on?**

18    A. A former employee came in, one that I knew well,

19    that had complained and sat and moped for two years about

20    his wage. Finally got a good job down at the wharf, fuel

21    truck tanker, making 20-some-odd dollars an hour working,

22    getting all this hefty overtime, working 12 hours a day

23    six days a week.

24    And he come in one day, said he wanted to come

25    back to work. And I says -- I says, you have a wife and

1  child to think about now.  I says, you moped in that
2  lobby for two years, you were miserable, you were
3  unhappy.  I says, what you ought to do is think about it
4  and keep the job you got.  You're making a good wage, you
5  got a child now and you're married.  What do you want to
6  come back here for 8 bucks an hour, 9 bucks an hour when
7  you're making 23, 20-some-odd dollars and all the
8  overtime.
9       That's what the conversation was.  They took me
10  upstairs.  I explained that to Christian (sic) and Kim.
11  And that was the end of it.  And then I saw some
12  paperwork down the trail that said otherwise.  And that's
13  because the guy who signed the letter and fired me was
14  the one that started that rumor.
15       But if you call Shawn Callahan right now, I
16  haven't talked to him since, the year was 2001, maybe,
17  he'll verify everything I just said.  Point --
18  interesting point.
19  **Q.  Actually, my notes have it as January 9, 2003.**
20  A.  January 9, 2003?
21  **Q.  Could we be talking about a different incident?**
22  A.  No.  He did come in January 9th, 2003.  I talked
23  to him over the counter.  But I have not talked to him in
24  private or person in a personal life situation since he
25  worked as a regular full-time employee with Signature,

1  Rehabilitation Medicine Associates in early April 2003.

2  Let's jump ahead two weeks now.  And I'm going to show

3  you what's been marked as Exhibit 13, which is a two-page

4  document.  The first page being a fax cover sheet from

5  Karen Galvin, MS, licensed psychological associate.  The

6  second page being a release of information and then some

7  handwritten notes to Ms. Cleeves.

8        You can take a moment to read that over and let

9  me know when you have.

10     A.  Okay.

11     Q.  Have you had a chance to look at Exhibit 13?

12     A.  Yes.

13     Q.  First of all, Karen Galvin, is this the Karen

14  you were referring to earlier in your deposition as the

15  counselor that you sought treatment from in Anchorage?

16     A.  Yes.

17     Q.  On the second page of this document, Karen

18  Galvin writes:  Recent events in Richard's life triggered

19  past major traumas and severe anxiety.

20        What happened around this time that triggered

21  past major traumas and severe anxiety?

22     A.  It could have been the job situation, being in a

23  job where there was no job satisfaction at all.  There

24  was no real purpose.  There was a lot of attitude

25  directed towards me.  In other words no communication,

1   cold, condescending, disrespectful. That's when they

2   moved me over to the executive terminal.

3          I was over there and I just, just I couldn't

4   take it anymore. I had an emotional collapse, I went up

5   in Kim's room and collapsed and began to weep and cry. I

6   just can't take it anymore.

7          I had twice to talk to Christian Kirschbaum

8   about it, but she -- she couldn't see it. She didn't

9   understand that people are light switches. And they were

10  just mistreating me to the point, those young kids, there

11  was no communique, there was no support system left,

12  there was nothing.

13         I would come to work day after day after day

14  after day and basically they were real efficient, quick

15  on the computer. I was basically computer illiterate. I

16  guess I was good for driving the pilots to their hotels

17  and that's about it. I didn't do much more, make some

18  coffee every day.

19         After the job that I'd had and worked into and

20  after my job injuries, it just became a drudgery when

21  they put me over to the executive terminal. Basically I

22  was an outsider. The executive terminal, people that

23  worked there were there from the beginning, and when John

24  sold it to Signature, they retained their position and

25  wage. And they were a clique. And I was never accepted

1    and the young kids there never accepted me either.

2         They were 20, 21, 19, 20, 21.  I don't know how

3    old they were, they were 20, around 20, meaning they

4    could have been 22, but --

5         **Q.  Were they -- were they mean to you or were they**

6    **just indifferent to you?**

7         A.  They were indifferent and abusive in their own

8    way.  It was not like -- they wouldn't talk to me.  I

9    spoke to Christine (sic) Kirschbaum twice in her office

10   on two different occasions in the winter of 2003, meaning

11   January, February, March.  And to no avail, there was

12   nothing done.  She couldn't see it.

13        **Q.  What did you ask her to do?**

14        A.  To talk to the children and let them know that I

15   needed to work together as a team with them, that I was

16   an accepted part of the structure there.  And that I had

17   value.  But she says that's not what was going on.  And I

18   says, well, she wouldn't -- she couldn't see it, see.

19        When she came downstairs, she was all smiles and

20   everybody was just as sweet as can be, like raw honey.

21   When she went upstairs, you could see her legs disappear,

22   everything changed immediately.  And everybody knew it.

23   Guy sitting over there knew it, the kid sitting next to

24   me knew it.  It was a terrible game that they were

25   playing.

1    **Q. What did they start doing to you?**

2    A. Just ignoring me, shutting me out. For one

3    thing, you don't shut out your team -- team members, you

4    know. I'm sitting there all day wondering, well, now

5    what do I do? There was nothing for me to do because

6    they jump on it. If you're not computer illiterate

7    (sic), I got pushed aside every time. They'd get

8    everything coming up so quick and, man, I couldn't even

9    follow it. And if I tried to follow something, they

10    wouldn't slow down, I'd say, would you stop, let me see.

11    Everything from aircraft movement to catering

12    orders to, actually, executive, corporate executive,

13    corporate information, I -- I wasn't learning anything.

14    And I sat there for many weeks and it just caused me a

15    lot of stress. I didn't even enjoy going to work

16    anymore, I was just sitting in the chair, filling space

17    and nobody would do anything about it.

18    **Q. Now, this note here talks about these events**

19    **triggering past major traumas. What were the past major**

20    **traumas that you had suffered?**

21    A. Job injuries on the job. You know, I wasn't --

22    I didn't feel I was being dealt with appropriately, even,

23    I wasn't trained appropriately --

24    MR. GAZAWAY: Focus on his question, answer his

25    question.

1    **Q. And what happened to end that marriage?**

2    A. She was -- is -- is interested in other men.

3    **Q. Okay.**

4    A. Meaning more than one.

5    **Q. And have you sought counseling for anything**

6    **related to either that relationship or the ending of that**

7    **relationship?**

8    A. No, and I don't care.

9    **Q. In this Exhibit 13 Karen Galvin also writes that**

10    **she supports your assessment that some time off work to**

11    **attend to these stressors is necessary.**

12    **Did you tell Karen Galvin that you thought you**

13    **needed some time off to deal with stress and anxiety in**

14    **your life?**

15    A. I don't remember. Evidently I was still

16    working. It was April 16, 2003. Okay. April 17th, I

17    don't remember that. Did they give me time off? I don't

18    know.

19    **Q. What's the last day that you actually performed**

20    **work for Signature Flight Support?**

21    A. I do not know. I know that on May 5th I believe

22    I was at the doctor's, I was sick. So I must have left

23    later in April sometime, or May 5th. Well --

24    **Q. Did you, after talking to Karen Cleeves (sic),**

25    **in mid-April, about taking time off work to deal with**

1    BY MR. DEVINE:

2        **Q. All right. In the first section --**

3        MR. GAZAWAY:  There's two sections.  There's a

4    conflict, there's two different pieces of the

5    information and two different sections, a typed form

6    for typed-in information.

7        MR. DEVINE:  You're absolutely right.

8    BY MR. DEVINE:

9        **Q. So in the first section, if I read this**

10    **correctly, your employer is saying that your last date of**

11    **work was April 14th, 2003, but that you were paid through**

12    **April 24, 2003.  And in the employee section you're**

13    **claiming that the last date you worked was April 24,**

14    **2003.  Is that how we should read this document?**

15        A.  The day that I last worked was April 24th and

16    here I have first missed work due to disability on May

17    5th.

18        **Q. Do you have a current memory of what your last**

19    **day was that you actually showed up for work?**

20        A.  Somewhere -- I know somewhere at the end of

21    April.  I always figured it was about April 24th, or

22    April 27th, but here it says April 24th.

23        I thought it was the 27th or 28th, but I was

24    wrong, it was April 24th.

25        **Q. All right.  Just so I -- I'm clear, do you**

1    Q. -- in June of 2003?

2    A. Yes. Every day.

3    Q. Let me now show you now what's been marked as

4    Exhibit 21, and ask you if you can identify that

5    document?

6    A. Okay. Yeah. I'm familiar with that, yeah.

7    Q. You're familiar with Exhibit 21?

8    A. Yes.

9    Q. And does Exhibit 21 indicate -- well, first of

10   all, this is dated June 29th, 2003, correct?

11   A. Correct.

12   Q. Did you return to work at Signature anytime in

13   June of 2003?

14   A. No, huh-uh.

15   Q. And does this document indicate that you will be

16   able to return to work July 14, 2003?

17   A. Yes.

18   Q. Did you have any discussions with anyone at

19   Signature about returning to work on July 14, 2003?

20   A. I called Kim.

21   Q. That's Kim Cleeves?

22   A. Yes.

23   Q. And what was the conversation you had with Kim

24   Cleeves?

25   A. Well, I told her I'd be back Monday, July 14th,

1    at 9:00 a.m.  I asked her a time and that -- that was the

2    normal time.  And she said:  No, not until you get

3    another medical release.  I said:  We sent you a medical

4    release, doctors released me for that time.  And she

5    said:  I need another medical release.

6         So I told her:  Well, then I'll have to get

7    another one.  I don't have, that's all I have right now.

8    And I did get another one.  It took me a few days because

9    that's what it took.  Doctor was -- wasn't available.

10    **Q.  Now, you had had, through May and June, sever:**

11    **of these status reports from First Care that said you**

12    **would go back to work, be able to go back to work on a**

13    **certain date.  And each time that date got extended,**

14    **correct?**

15    A.  Well, I only see one time it did.  I resumed

16    regular work on May 26th but didn't -- I didn't -- he

17    didn't release me.  He sent them another thing that said

18    I wouldn't be able to work right now.  I was still very

19    sick.  He sent it May 25th, the day before the regular

20    work he sent, he -- you know, he sent another one May

21    25th.

22    **Q.  And, actually, if you look at Exhibit 14, the**

23    **first one of these that came from First Care Medical**

24    **Center, this one on May 11th, he's indicating that you'll**

25    **be back to work on -- or the period of disability is from**

1    Q. And Kim Cleeves apparently then, when you talked
2  to her about your returning to work on July 14, 2006,
3  said she wanted you to, what, go to your doctor and get
4  a -- what did he she call it?
5    A. Another medical -- medical release.
6    Q. She wanted something from the doctor that said
7  you were capable of performing your duties?
8    A. Yes, she wanted another medical release. They
9  had sent two. And the first one was lost. And we sent
10  another one. Because I would call and ask them: Did you
11  receive this? They said no. So we'd send another one.
12  We sent it twice.
13    And then when I called, Kim sent me back Monday
14  morning 9:00 a.m. July 14th, we just chitchatted and then
15  she says I won't be able to come back, I need another
16  medical release. And I told: Well, that's all I have.
17  I gave you what I had, Kim. I says, I'll see what I can
18  do. I'll get you another one. You know, this is
19  Thursday; Monday's Monday.
20    And then come Monday morning instead of 9:00
21  a.m. I didn't show up, of course, because I didn't have
22  another medical release. And 10:00 a.m. there was a
23  certified letter typed out that said that I had abandoned
24  my job and they had basically eliminated my employment.
25    Q. Did you call Kim Cleeves on the morning of

1    **Monday July 14th and tell her you hadn't been able to get**

2    **a release so you were not coming in that day, as you had**

3    **said you would?**

4        A.  No.  She already understood that I wouldn't be

5    in because we had talked about it the Thursday before.

6        **Q.  I -- sorry, maybe I misunderstood you.  I**

7    **thought you had said that you had told Kim that you would**

8    **do your best to get a medical release and bring it on**

9    **Monday?**

10        MR. GAZAWAY:  Objection, mischaracterizes his

11        testimony.

12    BY MR. DEVINE:

13        **Q.  Maybe I did.  Did I characterize your testimony**

14    **wrong?**

15        A.  Yes.

16        **Q.  What did you tell Kim Cleeves?**

17        A.  I told Kim Cleeves, I said that I would be in

18    Monday morning at 9:00 a.m. July 14th, that she had got

19    my medical release.  And she said yes.  And I says that's

20    when the doctor indicated Monday morning.  I says this,

21    that and the other and we chitchatted.  And I says, well,

22    I'll be there.  She says, no, I need another medical

23    release.  I says, well, Kim, I says that's all I have

24    right now.  There's not going to be no time between now

25    and Monday to get one, simply because you have to make an

1  appointment, doctors are busy.  And she says, well,

2  you're going to need another one.  I says, well, all

3  right then, but I'll have to get one.

4         And but problem is Monday morning at 10:00 a.m.

5  they wrote me a letter by certified mail and they said

6  that you are supposed to be here at 9:00 a.m. you

7  abandoned your job so we've discharged you.  And --

8      **Q.  Let me show you what's been marked as Exhibit**

9  **22.  Is this the letter you're talking about?**

10     A.  That's the letter, yeah.

11     **Q.  And it's dated July 14, 2003?**

12     A.  Yes.  Uh-huh.

13     **Q.  And did you receive this letter a day or two or**

14  **three days later?**

15     A.  Actually, I received it the next morning at

16  10:00 a.m., July 15th.

17     **Q.  Okay.  And signed for it?**

18     A.  Uh-huh.

19     **Q.  Was that a yes?**

20     A.  Yes.  Yeah.

21     **Q.  Now, Kim Cleeves has described two telephone**

22  **contacts with you on July 10th of 2003.  And I want to**

23  **discuss those with you to see if you agree with her or**

24  **disagree with her.**

25         **The first one she describes was calling and**